UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

| | |
|---|---|
| LISA LEE-BOLTON, JAMES DUNCAN, CATHERINE MCMAHON, and NANCY KAREN DAY, on behalf of themselves and all others similarly situated, and RICHARD BOLTON and ROY GEIERSBACH, on behalf of themselves, <br><br>　　Plaintiffs, <br><br>　　v. <br><br>KOPPERS INC., f/k/a KOPPERS INDUSTRIES, INC., *et al.*, <br><br>　　Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )     CASE NO. 1:10-CV-253-SPM-GRJ |

**DEFENDANTS KOPPERS INC. AND BEAZER EAST INC.'S MOTION TO EXCLUDE PLAINTIFFS' EXPERT WILLIAM R. SAWYER, Ph.D., AND INCORPORATED <u>MEMORANDUM OF LAW</u>**

Defendants Koppers Inc. and Beazer East, Inc. move to exclude the opinion and testimony of Plaintiffs' expert, William R. Sawyer, Ph.D., from any proceedings in this action, including trial. Dr. Sawyer's report is replete with unsupported conclusions about the two areas of his opinions—the need for remediation and "excessive and persistent cancer risks." His bases for coming to these conclusions are flawed and unreliable. As for his opinion on remediation, Dr. Sawyer fails to explain <u>why</u> remediation of homes over a self-created single benchmark is necessary. As to health risks, while Dr. Sawyer claims that the individuals in the class area are subject to "increased" cancer risk, he fails to explain *why* or *how* this increased cancer risk is significant. Dr. Sawyer's "because I said so" conclusions cannot survive scrutiny under *Daubert* and must be excluded.

1

## BACKGROUND

Plaintiffs claim in this case that Defendants caused the contamination of properties surrounding the Koppers Site located along Northwest 23rd Avenue in Gainesville, Florida (*See* Second Amended Class Action Complaint (Doc. 238) ("2d Am. Compl."), p. 3, ¶ 1.) Plaintiffs allege the release, discharge, and/or dispersion of various materials from the Koppers Site "onto each Representative Plaintiffs' and Named Plaintiff's and putative class members' residences and real properties." (*Id.*, p. 4, ¶ 4.) The allegations that Plaintiffs make of contaminated properties extend outwards within a 2-mile boundary of the Koppers Site in all directions, in what Plaintiffs label the "Class Affected Area." (*Id.*, p. 4, ¶ 5.)

Plaintiffs offer Dr. Sawyer to provide a toxicological risk assessment of the residences in the proposed class area. Dr. Sawyer is not board certified in toxicology, conceding in his deposition that he twice failed the examinations of the American Board of Toxicology. (Deposition of William R. Sawyer, Ph.D. ("Sawyer Dep."), pp. 30-31) (relevant excerpts attached as Exhibit 1).) Although a member of the Academy of Forensic Sciences, Dr. Sawyer has never sought certification in toxicology from the Academy. (*Id.*) He is also not certified in the field of Clinical Toxicology. (*Id.*, p. 31.) Dr. Sawyer concedes that he has had to testify in over 100 *Daubert* or *Frye* hearings directed against him. (*Id.*, pp. 34.)[1]

Dr. Sawyer's report in this case (Affidavit of Expert Witness William R. Sawyer ("Sawyer Rep.") (attached as Exhibit 2)) proffers two opinions relating to the question of class certification.

First, Dr. Sawyer opines that household and attic dust remediation is needed in the proposed class area ("remediation opinion"). (Sawyer Rep., p. 31.) Dr. Sawyer comes to this

---

[1] Plaintiffs have refused to produce the list kept by Dr. Sawyer of the challenges at which he testified and Defendants believe that Dr. Sawyer's testimony as to the number of times his opinions were found to be unreliable or excluded not to be accurate.

2

conclusion by comparing two categories of information: (i) generating the mean average of dust concentration from a self-selected background area comprised of floor samples taken by the Environmental Protection Agency and living area CALUX dust samples taken by the Plaintiffs, and comparing that number to the (ii) averages of CALUX living area dust sample results in the proposed class area. (*Id.,* pp. 7, 31.) Dr. Sawyer, however, fails to substantiate or explain why this approach is reliable or appropriate. In addition, in doing so he mixes his comparison of floor samples with living area samples, which even he concedes are dramatically different. Finally, while Dr. Sawyer includes attic dust as a contaminated matrix, he performed absolutely no analysis of any attic dust data whatsoever and provides no guideposts, standards, or regulations upon which to base a conclusion that attic sample results in the Class Affected Area are "contaminated." Simply put, there is zero support for this conclusion.

Second, Dr. Sawyer concludes that the failure to remediate will result in "excessive and persistent health risks to the individuals in the class area." (*Id.*, p. 31.) To come to this conclusion, Dr. Sawyer calculates lifetime total cancer risks for a background area and the proposed class area, concluding that the individuals in the class area are at risk. (*Id.*) Again, Dr. Sawyer's report contains no reliable bases to support his conclusions. It is the ultimate "because I said so" opinion. As to whether the admittedly "low" risk cancer numbers compel remediation, the best Dr. Sawyer can say is "it depends." (Sawyer Dep., pp. 110-13.) Dr. Sawyer concedes there are no controlling regulatory levels for cancer risks, and his opinion contains no other standards or basis for concluding that the risks he calculates are in any way unacceptable. He has done no individual dose or exposure analysis and ignores countless reports at odds with his opinions here. The analysis he performs fails to support the conclusion he would have the Court accept.

**LEGAL STANDARD**

The Court should exercise its gatekeeping power under Federal Rule of Evidence 702 and the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and exclude the opinions of Dr. Sawyer. Expert opinion testimony is only admissible under the Federal Rules of Evidence if the opinion is reliable, relevant, and helpful to the fact finder. *Daubert*, 509 U.S. at 579; Fed. R. Evid. 702. It is the responsibility of the district court, as gatekeeper, to ensure that speculative or unreliable opinions do not reach the jury. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005); *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009) (J. Rodgers), *aff'd sub nom.*, 609 F.3d 1183 (11th Cir. 2010).

In connection with class certification proceedings, a *Daubert* analysis must be undertaken before a class is certified based on expert testimony. *Sher v. Raytheon Co.*, 419 F. App'x 887, 891 (11th Cir. 2011). In *Raytheon*, the Eleventh Circuit found that the district court, by refusing a *Daubert*-like critique and not weighing conflicting expert testimony, did not determine facts sufficient to determine whether or not class certification was appropriate. *Id.* at 891. Specifically, in deciding whether to admit expert opinion, the district court must consider whether: (1) the expert is qualified to testify competently, (2) the methodology by which the expert reaches his conclusions is reliable, and (3) the expert's testimony assists the trier of fact to understand the evidence or determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562-63 (11th Cir. 1998); *Bryan v. Whitfield*, 3:14-cv-341/MCR/EMT, 2015 WL 3407485, at *2 (N.D. Fl. Mar. 16, 2015) (Rodgers, J.).

Plaintiffs bear the burden of establishing the admissibility of Dr. Sawyer's testimony by a preponderance of the evidence. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th

Cir. 1999). That burden is "substantial." *Cook ex rel. Tessier v. Sheriff of Monroe Cnty., Fla.,* 402 F.3d 1092, 1107 (11th Cir. 2005). Plaintiffs' burden also requires more than just "taking the expert's word for it." Fed. R. Evid. 702, advisory committee's note, 2000 amendment (internal quotation marks omitted). Neither *Daubert* nor Federal Rule of Evidence 702 requires the district court to admit opinion evidence that is only connected to existing data by the *ipse dixit* of the expert. *Gen. Elec. Co.*, 522 U.S. at 146; *Chapman v. Procter & Gamble Distr., LLC*, 766 F.3d 1296, 1305-06 (11th Cir. 2014).

Instead, the district judge must determine whether the evidence is genuinely scientific or unscientific speculation offered by a genuine scientist. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316-17 (11th Cir. 1999). *"[A]ny step that renders the [expert's] analysis unreliable under the Daubert factors renders the expert's testimony inadmissible." McClain,* 401 F.3d at 1245 (11th Cir. 2005); *see also Hendrix*, 255 F.R.D. at 578 ("[T]he court must undertake an independent analysis of each step in the logic leading to the expert's conclusions; if the analysis is deemed unreliable at any step the expert's entire opinion must be excluded."). In this instance, Dr. Sawyer's remediation and risk assessment opinions do not pass scrutiny under *Daubert* and must be excluded.

## ARGUMENT

### I. Dr. Sawyer's Remediation Opinion Is Inadmissible Under *Daubert*

Dr. Sawyer's conclusion that remediation is needed in the class area is based on a comparison of dust sample results. He selected his own background area using floor dust samples from the EPA and CALUX-based samples from the living quarters of homes outside the scope of the plant to create a "benchmark," and then he compared this to dust samples from living areas gathered by Plaintiffs and their consultants. Dr. Sawyer also includes attic dust in his

5

ultimate conclusion, despite no consideration of attic samples in creating his "benchmark" or addressing any of the attic samples taken by plaintiff's consultants. His opinion suffers from a number of flaws and should be excluded.

### A. Dr. Sawyer's 57.08 pg/g Benchmark Is *Ipse Dixit*

In his report, Dr. Sawyer arrives at his "benchmark" for dust concentration amounting to a level of 57.08 pg/g (picograms/grams, i.e., parts per trillion) (the "57.08 pg/g benchmark"). (Sawyer Rep., p. 31.) The 57.08 pg/g benchmark represents the mean average dust concentration between certain Plaintiff-selected homes for living space dust only and EPA sampling of floor dust samples. (*Id.*, p. 7; Sawyer Dep., p. 113.) Attic samples were not included in this benchmark. Dr. Sawyer then concludes that homes in the class area with living quarter dust loads above the 57.08 pg/g benchmark require remediation. (Sawyer Dep. p. 78.) But, Dr. Sawyer's report fails to provide any explanation as to why the concentration mean of random background samples is the appropriate method by which to judge remediation.

In fact, there is no support whatsoever in his report as to why a dioxin CALUX TEQ level greater than 57.08 pg/g needs remediation. During his deposition, Dr. Sawyer admitted being aware that the EPA standard risk-based screening level for exposure to dust in homes is 190 parts per trillion for dioxin. (*Id.*, p. 78.) Dr. Sawyer further admitted that the EPA measure for dust is three times the 57.08 pg/g benchmark that he arbitrarily set. (*Id.*, p. 79.) At his deposition, Dr. Sawyer attempted to justify his arbitrary remediation benchmark by referencing, without explanation, an uncited 2015 regional screening value for *soil* of 4.5 picograms per gram. (*Id.*, pp. 77-79.) This explanation does nothing to cure the deficiencies in his report or counter the EPA dust standard risk-based screening level of 190 parts per trillion for dioxin.

Moreover, Dr. Sawyer discounts the impact of the remediation of the soil in the homes immediately adjacent to the plant. The EPA and Florida Department of Health have evaluated the impact of the Beazer soil remediation activities and concluded that household dust levels have been reduced to background and safe levels. *See* January 2015 Florida Department of Health "Neighborhood Update" (exhibit 9 to Sawyer Dep. and attached here as Exhibit 3); *see also* February 18, 2015 letter from the EPA to the City of Gainesville ("EPA Letter") (exhibit 10 to Sawyer Dep. and attached here as Exhibit 4). Dr. Sawyer completely ignored the testing in his report and dismisses without analysis the fact that the soil remediation has been effective, calling the EPA testing a "farce." (Sawyer Dep., pp. 101-02.) *Daubert* surely requires a more rigorous analysis than simply name calling.

Dr. Sawyer's report contains no studies, documentation, or explanation as to why 57.08 pg/g is a proper benchmark for remediation or why he dismisses evaluation by Federal and State agencies. This is a classic example of opinion testimony where the value is purely *ipse dixit* of the expert. But "the trial court's gatekeeping function requires more than simply taking the expert's word for it." *McClain*, 401 F.3d at 1244. This sort of *ipse dixit* has no place at the foundation of an expert's work. As the Eleventh Circuit explains, "an expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion." *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir. 2003). Dr. Sawyer fails to explain the basis for his 57.08 pg/g benchmark in his report. The Court should not take Dr. Sawyer's "word for it" and should exclude his unexplained 57.08 pg/g benchmark as impermissible *ipse dixit*.

      B.      **Dr. Sawyer Provides No Basis for Mixing Various Sample Areas**

Further undermining the reliability of Dr. Sawyer's 57.08 pg/g benchmark is the fact his background dust samples are mixed and inconsistent. Dr. Sawyer's background number mixes

and matches concentrations of indoor dust attributable to living areas and floor dust. Floor dust is representative of what is being tracked into the house and airborne exposure in the home. *See* Deposition of Michael R. Corn, P.E. ("Corn Dep."), p. 184 (relevant excerpts attached as Exhibit 5); *see also* Deposition of Shari B. Libicki, Ph.D. ("Libicki Dep."), p. 143 (relevant excerpts attached as Exhibit 6). On the other hand, according to Dr. Sawyer, living area dust is representative of longstanding or retained dust in the house. (Sawyer Dep., p. 95.) Dr. Sawyer was keen to point out during his deposition that he considers floor dust to be a different matrix than living area dust and, as noted above, that the EPA's reliance on floor samples to be "a farce." (*Id.*, pp. 98, 102.) And yet he relied on EPA's floor data when it suits his purpose to concoct his living area background number.

So despite being different matrixes, Dr. Sawyer mixes floor dust with living area dust in his background when advantageous. (*See* Sawyer Rep., p. 12; Sawyer Dep., pp. 101-02.) But then he compares it only to the sampling of living area dust conducted by the Plaintiffs. He fails to include the floor sample results taken near the plant by the EPA. This comparison between mixed concentrations of floor dust and living area dust with living area dust alone is neither a proper nor helpful comparison, and more important, Dr. Sawyer has provided no explanation for it. His comparison of apples to oranges at the foundation of his opinion renders it unreliable, extremely suspect, and it should be excluded.

### C. Dr. Sawyer's Attic Dust Remediation Conclusion Is Unsupported

Dr. Sawyer also opines in his report that the attic dust of the homes in the proposed class area requires remediation. (Sawyer Rep., p. 31.) But this conclusion is entirely unsupported in Dr. Sawyer's report, which contains no analysis concerning the dioxin concentration of any attic samples of homes in the proposed class area or even his self-selected background area. His 57.08

8

pg/g benchmark is entirely made up of floor and living area dust. (Sawyer Dep., pp. 101-02.) He does not use attic samples in his risk assessment, and does not provide a single analysis where attic dust sample results are analyzed or evaluated. He cites to no authority as to what constitutes elevated levels of dioxins in attics. He points to no EPA or other regulatory guideposts to support the opinion that attic levels in the class area are in any way unusual or above any level of concern. There is no support for his conclusion of the "need to test and remediate attic dust as well as living quarters." (Sawyer Rep., p. 26.) Once again, Dr. Sawyer is asking the Court to take his word for it, with nothing more. Dr. Sawyer's unsubstantiated conclusion must be excluded.

> **D.     Dr. Sawyer's Remediation Opinion Fails to Consider Relevant Contradictory Reports**

Comparison to an evaluation performed by an independent federal agency examining the precise issue of whether remediation is necessary reveals the utter lack of scientific rigor in Dr. Sawyer's opinion. *See* May 23, 2013 EPA Indoor Dust Study Data Report ("2013 EPA Dust Rep.") (attached as Exhibit 7).[2] In the report, the EPA evaluated the risks associated with dioxin concentrations of indoor dust in the proposed class area to determine whether remediation is necessary. (2013 EPA Dust Rep., pp. 846-47.) The EPA concluded that no action is required to remediate the indoor dust of the homes in the proposed class area. (*Id.*, p. 847.) Although it squarely addresses the subject of his opinions in this case, Dr. Sawyer failed to even consider the EPA Report. That Dr. Sawyer failed to even acknowledge this relevant evaluation of the necessity of remediation demonstrates that Dr. Sawyer's remediation opinion is unreliable and nothing more than a piece of advocacy; it should be excluded.

---

[2] The EPA Report is not originally paginated, but citations are made to the last three numbers of the Bates Range on each page.

## II. Dr. Sawyer's Opinion as to "Excessive and Persistent Health Risks" Has No Basis and Is Unreliable

Dr. Sawyer's opinion as to health risks also improperly asks the Court to merely take him at his word. In his report, Dr. Sawyer makes reference to unquantified risk "calculations" that he relies on to conclude that the individuals in the class area will suffer excessive and persistent health risks. (Sawyer Rep., p. 31.) Dr. Sawyer's conclusion is based on several unreliable factors. First, Dr. Sawyer's conclusions are improperly based on CALUX numbers that are not proper to use for risk assessment purposes. Second, neither Dr. Sawyer's report nor any regulatory or scientific standard offer support to interpret his "calculations." Finally, his conclusion is contrary to several unbiased government reports on the health risk facing individuals in the proposed class area, which conclude there are no elevated cancer levels in the proposed class area over several decades of analysis. For these reasons, Dr. Sawyer's risk assessment opinion must be excluded.

### A. Dr. Sawyer's Use of Total CALUX-based Results Is Not Appropriate for Risk Assessment

Dr. Sawyer's risk assessment suffers a fundamental and fatal flaw in its reliance on CALUX sample results used in the creation of his risk assessment. (*Id.*, p. 29.) Dr. Sawyer's report cites to no studies that use the CALUX method in human health risk assessment. (Sawyer Dep., p. 75.)

As discussed at length in the Defendants' *Daubert* motion related to CALUX (which is incorporated by reference herein), the CALUX method is not a reliable measure for judging health risk. Toxicity, for risk assessment purposes, is only based on <u>chlorinated</u> dioxins. *See* July 24, 2014 Florida Department of Health "Health Consultation" on Indoor Dust ("2014 FDOH Rep."), p. 10 (exhibit 16 to Sawyer Dep. and attached here as Exhibit 8). The CALUX TCDD-

BEQ used by Dr. Sawyer represents not only chlorinated dioxins but <u>total</u> dioxin emissions, which includes brominated dioxins, PCBs, and other dioxin-like compounds. Even Dr. Sawyer admits that brominated dioxins are not toxic. (Sawyer Dep., p. 65.)

Perhaps the best example of the contrived use of CALUX is seen in Sawyer's "worst case scenario" risk numbers contained in Table 15 of his report. Here he calculates a risk number for a home at 618 NW 2nd Street, using a CALUX number of 735 ppt. However, this was one of the few homes which was also tested using the GC/MS methodology The number for the chlorinated dioxins came out almost 64 percent less at 267 ppt. (Sawyer Dep., p. 81.) At his deposition, Dr. Sawyer testified that he was aware of the GC/MS result for that location, but said that it "was largely composed of Koppers pentachlorophenol-derived dioxin." (*Id.*, p. 112.) In reality, however, it was only 36% of the CALUX number and if used would have affected the validity of his "worst case number." (*Id.*, p. 81.) Rather than use a more accurate methodology and number, Dr. Sawyer chose a value he knew was inflated.

As such, this situation is similar to that in *Coleman v. Union Carbide Corp.* In *Coleman*, the district court excluded an expert under *Daubert* for using total dioxin emissions for the purposes of assessing health risk. No. 2:11-0366, 2013 WL 5461855, at *33 (S.D. W.V. Sept. 30, 2013). The court determined this was improper because "total dioxin emission figures tell one little if anything about risk assessment or toxicological response." *Id.* Since risk assessment is based on the chlorinated concentration present in the sample, the CALUX method is not reliable for assessing health risks and Dr. Sawyer's risk assessment opinion should also be excluded.

This conclusion is fortified by the actions of the Florida Department of Health ("FDOH") in determining the potential health risks of the proposed class area. Aside from concluding that dioxin levels in the class do not pose a health risk, the FDOH stated that they "cannot assess the

11

health risk based on the results of the CALUX screening bioassay." (2014 FDOH Rep., p. 10.) Dr. Sawyer relied on CALUX results in coming up with his risk assessment. Accordingly, his conclusions relating to health assessment must be excluded as unreliable.

### B. Dr. Sawyer's Risk Assessment is *Ipse Dixit*

The conclusions Dr. Sawyer derives from his risk probability calculations are speculative and not tied to actual exposure much less alleged risk for harm. In his report, Dr. Sawyer calculates a lifetime total cancer risk of 4.09E-05 (0.0000409) for his self-selected background area and 9.87E-05 (0.0000987) for the proposed class area. (Sawyer Rep., p. 29.) When asked if these numbers are acceptable levels, the best Dr. Sawyer can respond is it "depends." (Sawyer Dep., p. 110.) He further acknowledges the numbers present "low cancer risks." (*Id.*, pp. 110-111.) Nowhere in his report does Dr. Sawyer discuss, cite, or compare his speculative total cancer risk figures to any relevant regulatory guidelines. In fact, Dr. Sawyer admits that there is no regulatory standard with respect to the health dangers of dioxins in living area dust. (Sawyer Rep., p. 31.) Dr. Sawyer does not explain why he believes the difference between 4.09E-05 (background) and 9.87E-05 (class area) might be significant.

Dr. Sawyer's admissions in his deposition testimony highlight the disconnect between his risk assessment numbers and his conclusion that the class area is subject to a uniform health risk from dioxin contamination. Specially, Dr. Sawyer admits that his 9.87E-05 number is a <u>low</u> cancer risk. (Sawyer Dep., p. 110.) Despite this low cancer risk, Dr. Sawyer advocates for remediation of thousands of homes. This conclusion, however, is contrary to regulatory guidance. The Florida Department of Health does not recommend remediation on a class basis if the increased cancer risk is low. (2014 FDOH Rep., p. 15.) Dr. Sawyer does not explain why, in

this case, a low cancer risk merits class wide remediation or poses class wide health risks, and his opinion is, therefore, of no help to the Court in deciding class certification.[3]

Dr. Sawyer also admits that basing remediation on cancer risk probabilities is a cost/benefit analysis. (Sawyer Dep., p. 51.) Yet, Dr. Sawyer's report does not include a cost/benefit analysis or explain why, again, a low cancer risk merits remediation. (*Id*. at 110.) Dr. Sawyer's deposition is illuminating on why he thinks 9.87E-05 poses a significant health risk in the class area. When asked if 9.87E-05 is an acceptable cancer risk, Dr. Sawyer responds that it is unacceptable if the residents want it removed. (*Id*., p. 82.) This unscientific "because I/they said so" reasoning is directly contrary to the scientific rigor required by *Daubert*.

### C. Dr. Sawyer's Risk Assessment Fails to Consider Relevant and Contrary Findings of the Florida Department of Health

Dr. Sawyer's self-serving health risk assessment opinion is even more troubling considering it is in direct opposition to the conclusions reached by the Florida Department of Health. Instead of considering the FDOH's reports, he ignores the data and conclusions, reaching his own because "I said so" opinions.

In 2011 and 2012, the Florida Department of Health engaged in a thorough analysis of the historical cancer rates for 18 types of cancer in the Stephen Foster neighborhood to determine if contaminants from the Koppers Site may have affected the area. *See* June 2011 Stephen Foster Neighborhood Cancer Review ("2011 FDOH Rep.") (exhibit 7 to Sawyer Dep. and attached here as Exhibit 9); *see also* March 2012 Alachua County Report, Review of Cancer Rates for Census

---

[3] In addition to the unreliability of his opinions, reliance on regulatory risk assessment as the methodology to define a class has been rejected by multiple federal district courts. *See, e.g., Rhodes v. E.I. DuPont de Nemours & Co*., 253 F.R.D. 365, 377-78 (S.D.W.V. 2008); *Rowe v. E.I. DuPont de Nemours & Co.*, 2008 WL 5412912, *13-14 (D.N.J. Dec. 23, 2008). Thus, Plaintiffs have not met their burden to establish that Dr. Sawyer's opinions satisfy the fit requirement of *Daubert* either.

Tract 3 ("2012 FDOH Rep.") (exhibit 8 to Sawyer Dep. and attached here as Exhibit 10.) After reviewing census tract data from years 1981 to 2000, the FDOH determined:

- A review of time periods 1981-2000 showed no increase in rates for the eighteen cancers evaluated in the Stephen Foster neighborhood. (2011 FDOH Rep., p. 13.)

- That the time period studied reflects "20 to 30 years of latency past the higher community exposures to contaminants possible in the 1950s and 1960s." (*Id.*)

- And that the length of the time period study "suggests that any exposures in this community have not been great enough to cause increased cancer rates." (*Id.*)

Similarly, the 2012 FDOH cancer study determined that a "[r]eview of the time periods 2001-2005, 2006-2008 and 1981-2008 generally did not reveal elevations in cancers of concern most likely to be associated with chronic exposure to contamination." (2012 FDOH Rep., p. 9.)

Shockingly, Dr. Sawyer never reviewed these reports in assessing and determining health risk in the proposed class area. (Sawyer Dep., p. 121 (answering that he had never seen the two FDOH studies until his deposition).) When questioned why he did not review the studies and whether they would have been relevant to his health risk assessment, Dr. Sawyer was dismissive, stating that the studies are merely "census tract," which are not relevant to his report because they "measured a much larger area that included people who were not exposed to above background." (*Id.*, p. 121.) In reality, however, they track the very area which is the subject of Plaintiffs proposed class area. *See* Deposition of Scott Phillips, M.D. ("Phillips Dep."), p. 102 (relevant excerpts attached as Exhibit 11). Dr. Sawyer's *post hoc* rationale for not considering the reports is troubling to say the least, but symbolic of his approach overall. His methodology is tainted by the conclusion he wanted to reach.

Much as he ignores the FDOH cancer studies, Dr. Sawyer ignores the conclusions reached by the Florida Department of Health under a Cooperative Agreement with the Agency for Toxic Substances and Disease Registry, U.S. Department of Health and Human Services. The

14

FDOH Dust Report evaluated exposure to possible dioxin-related indoor dust and assessed any accompanying human health risks in the proposed class area. (*See* 2014 FDOH Rep., p. iii.) For the purposes of assessing health risk, the government scientists assumed that the residents in the class area are exposed to the highest measure level of dioxins, even though most residents' exposure risk is significantly less. (*Id.*, p. 5.) Applying this conservative (meaning worst case) approach, the FDOH Dust Report concluded:

- The estimated increased cancer risk of residents in the class area is <u>very low</u>—about 1x10-5. (*Id.*, p. 15.)

- Due to this very low cancer risk, the residents in the proposed class area are unlikely to suffer any harm from exposure to in-home dust. (*Id.*)

- Therefore, FDOH Report recommended that no action needs to be taken to address the very low cancer risk associated with the in-home dust levels in the proposed class area. (*Id.*, pp. 15, 17.)

- As of February 18, 2015, the EPA has determined that soils in residential yards and the right-of-ways abutting residential yards are "safe." (Ex. 4, EPA Letter.)

Dr. Sawyer's conclusions are <u>directly</u> contrary to the findings and conclusions of the FDOH Dust Report and the EPA. This contradiction reveals Dr. Sawyer's report for what it is, advocacy masquerading as science. Accordingly, it must be excluded.

## III. Dr. Sawyer's Methodology Has Been Rejected Under *Daubert* Before

The very same tactics employed by Dr. Sawyer in this case and described above, were thoroughly considered and rejected by the Eastern District of Kentucky in *Adams v. Cooper Indus., Inc.*, 2007 WL 1805586 (E.D. Ky. June 21, 2007). In *Adams v. Cooper*, Dr. Sawyer was retained to determine whether certain bellwether plaintiffs' blood dioxin levels supported the proposition that they were exposed to dioxins or dioxin-like compounds. *Id.* at *2. Dr. Sawyer compared the plaintiffs' dioxin levels to the "background" population levels and opined that levels above the background mean were "abnormal." *Id.* at *4. The court summarily rejected this

15

methodology, holding that equating "abnormal" with "above-average" is not a scientifically valid methodology. *Id.* This is precisely the same plaintiff-to-background comparison that Dr. Sawyer attempts here.

The *Adams* Court went even further, however, criticizing Dr. Sawyer's reliance on "exaggerated" data samples and his "selective representation of data" because he selected only statistically-elevated test methods and results—strikingly similar to his reliance on CALUX data where more accurate GC/MS data exists. *Id* at *6-7. Finally, the *Adams* court found that Dr. Sawyer failed to acknowledge results and even entire studies that contradicted his findings. Here, Dr. Sawyer commits the same failure by ignoring FDOH and EPA conclusions about the low-risk factors in the area at issue.

## CONCLUSION

Dr. Sawyer has provided opinions with no substance. He creates facts and analysis without providing any basis for either his methodology or conclusions. Defendants request that the Court exercise its gatekeeping power and exclude the Dr. Sawyer's opinions and testimony.

## LOCAL RULE 7.1 CERTIFICATE

The undersigned counsel for Defendants certifies that he conferred with Plaintiffs' counsel in a good faith effort to resolve by agreement the issues raised but no agreement was reached.

Date:   September 10, 2015                    Respectfully submitted,

/s/ Cal R. Burnton
Benjamin H. Hill, III (FBN 094585)
Dennis P. Waggoner (FBN 509426)
HILL, WARD & HENDERSON P.A.
101 East Kennedy Blvd., Suite 3700
P.O. Box 2231

Tampa, FL 33602
Phone: (813) 221-3900
Fax: (813) 221-2900

and

Cal R. Burnton (ILBN 8186365)
*Admitted to Northern District Bar 5/12/14*
Steptoe & Johnson LLP
115 S. LaSalle, Suite 3100
Chicago, IL 60603
Phone: (312) 577-1300
Fax: (312) 577-1370

ATTORNEYS FOR BEAZER EAST, INC.
and KOPPERS INC.

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record in this action.

/s/ Cal R. Burnton