UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

| | |
|---|---|
| LISA LEE-BOLTON, JAMES DUNCAN, CATHERINE MCMAHON, and NANCY KAREN DAY, on behalf of themselves and all others similarly situated, and RICHARD BOLTON and ROY GEIERSBACH, on behalf of themselves, <br><br>Plaintiffs, <br><br>v. <br><br>KOPPERS INC., f/k/a KOPPERS INDUSTRIES, INC., *et al.*, <br><br>Defendants. | CASE NO. 1:10-CV-253-SPM-GRJ |

**DEFENDANTS KOPPERS INC. AND BEAZER EAST'S MOTION TO EXCLUDE UNDER RULE 702 THE TESTIMONY OF PLAINTIFFS' CLASS-CERTIFICATION EXPERT GEORGE C. FLOWERS, Ph.D., AND INCORPORATED MEMORANDUM OF LAW**

Defendants Koppers Inc. and Beazer East Inc. move under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.* to exclude the opinions and testimony of Plaintiffs' expert, George C. Flowers, Ph.D.  Dr. Flowers's opinions that depend on his improper reliance on data collected and analyzed using the CALUX method are subject of a separate Motion filed contemporaneously with this one.  However, Dr. Flowers's opinions also fail to meet the admissibility standard of Rule 702 and *Daubert* for additional grounds and should be excluded in their entirety.

Dr. Flowers's expert report is nothing but a smokescreen designed to confuse the Court into believing his conclusions are based in science.  First, Dr. Flowers invents an unreliable and unhelpful "rural background" methodology to support his conclusion that the soil in the proposed

urban class area is contaminated (by comparison) and that the Koppers Site is the source of the contamination.  Second, Dr. Flowers's opinion that contaminated dust is present in the living spaces of homes near the Koppers Site is tainted by the inclusion of brominated dioxins and polychlorinated biphenyls and by relying upon an unreliable background benchmark generated by Dr. Sawyer.  Finally, Dr. Flowers's opinion that attic dust in the class area is contaminated is unsupported by any legitimate analysis whatsoever relating to attic dust samples.  Instead, he uses Dr. Sawyer's living space background number to compare to attic samples taken up to 19 miles away from the Koppers Site—samples he concedes are near industrial and highway sources.  None of these opinions are grounded in science or shed light on the true issue of contamination.  They are unreliable and should be excluded.

## FACTUAL BACKGROUND

Plaintiffs claim that Defendants caused the alleged contamination of properties surrounding the Koppers Site located along Northwest 23rd Avenue in Gainesville, Florida.  (*See* Second Amended Class Action Complaint (Doc. 238) ("2d Am. Compl.") at *3, ¶ 1.)  Plaintiffs allege the release, discharge, and/or dispersion of various materials from the Koppers Site "onto each Representative Plaintiffs' and Named Plaintiff's and putative class members' residences and real properties."  (2d Am. Compl. at *4, ¶ 4.)  Plaintiffs allege that contaminated properties extend outwards within a 2-mile boundary of the Koppers Site in all directions, in what Plaintiffs label the "Class Affected Area."  (2d Am. Compl. at *4, ¶ 5.)

Dr. Flowers was retained to offer an opinion on contamination in the proposed class area.  Dr. Flowers oversaw two sampling exercises in 2010 and 2014.  The October 2010 exercise collected samples from living area dust (such as the tops of stoves and refrigerators) and surface soil from residences within a two mile radius of the Koppers Site.  (Deposition of George C.

Flowers, Ph.D. ("Flowers Dep."), p. 49 (attached as Exhibit 1).)  In total, 113 soil samples and 105 indoor dust samples were collected from about 116 sampling locations.  All were CALUX samples, but a small handful were sent to a different lab to perform a GC/MS analysis.  (Expert Report of George C. Flowers, Ph.D., May 15, 2015 ("Flowers Rep."), p. 5 (attached as Exhibit 2).)  (Defendants challenge, in a separate motion, the use of CALUX sample results, which is incorporated herein by reference.)

The 2014 exercise collected dust from the attic and living area from various houses from an east to west transect extending 19 miles from the western boundary of the Koppers Site.  Soil samples were also taken at those homes.  (*Id.*, p. 4.)  Similar to 2010, the majority of the samples were sent to XDS laboratories to analyze using CALUX, with a limited number of samples sent to a different laboratory for analysis using GC/MS.  (*Id.*, p. 5.)

Relying only on the CALUX-derived data from both campaigns, Dr. Flowers's expert report offers three conclusions pertaining to soil, living area dust, and attic dust as they relate to the question of class certification.  First, Dr. Flowers opines that the soil in the proposed class area is contaminated and that the Koppers Site is the point source of the contamination.  In coming to this conclusion, Dr. Flowers relies upon an unsupported and unreliable methodology where he compares a pristine rural background study performed by the Environmental Protection Agency in unrelated areas around the country, an area which he analogizes to a Garden of Eden type background, to the samples taken from the proposed class area.  Regardless of the comparison, there is no basis to conclude that any numbers that are greater than the "Garden of Eden" background number are, in fact, contaminated.  Dr. Flowers also compares the results to a site-corrected remediation standard for the State of Florida for soil and concludes that 10% of the

3

samples are in excess of the CALUX-"corrected" number. He fails to address in any way the results and impact of the recent remediation of soil in yards adjacent to the Koppers Site.

Second, Dr. Flowers concludes that the living space dust in homes in the proposed class area is contaminated. In coming to this conclusion, Dr. Flowers again relies on unadjusted CALUX data tainted by the improper inclusion of brominated dioxins and polychlorinated biphenyls. He compares these numbers to a background number generated by Dr. Sawyer based on not just living space dust, but floor samples taken by the EPA. This is an apples to oranges comparison and, like the use of the soil background number, does nothing to meaningfully address the topic of whether there is true contamination.

Finally, Dr. Flowers determines that the attic dust of the homes in the class area is contaminated. But in so concluding, Dr. Flowers does not analyze any attic dust background numbers, standards, regulations, or guidelines. Using only Dr. Sawyer's numbers from living space and floor samples, Dr. Flowers declares 52% of attics are contaminated. However, by including all of the dust samples from the 2014 sampling as site samples, including those going 19 miles out, Dr. Flowers includes samples Dr. Sawyer used as background, and also samples Dr. Sawyer rejected as "outliers" and not to be included. Much more is required under *Daubert*. The scientific underpinnings of these opinions are totally unreliable and must be excluded.

## LEGAL STANDARD

Expert opinion is only admissible under the Federal Rules of Evidence if the opinion is reliable, relevant, and helpful to the fact finder. *Daubert*, 509, U.S. 579 (1993); Fed. R. Evid. 702. It is the responsibility of the district court, as gatekeeper, to ensure that speculative or unreliable opinions do not reach the jury. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005);

*Hendrix v. Envenflo Co., Inc.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009) (Rodgers, J.), *aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183 (11th Cir. 2010). The Court should exercise its gatekeeping power under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and exclude Dr. Flowers's report and testimony.

In connection with class certification proceedings, a *Daubert* analysis must be undertaken before a class is certified based on expert testimony. *Sher v. Raytheon Co.*, 419 F. App'x 887, 891 (11th Cir. 2011). In *Raytheon*, the Eleventh Circuit vacated the certification of a class in an action alleging environmental contamination in Pinellas County, Florida, and held that "the district court erred as a matter of law by not sufficiently evaluating and weighing conflicting expert testimony . . . at the class certification stage." *Id.* at 890. The Eleventh Circuit found that the district court, by refusing a *Daubert*-like critique and not weighing conflicting expert testimony, did not determine facts sufficient to determine whether or not class certification was appropriate. *Id.* at 891. Thus, the examination of proposed expert opinions in support of class certification efforts under *Daubert* is critical—if the expert's proffered opinions cannot withstand the challenge, then they certainly cannot support class certification.

Specifically, in deciding whether to admit expert opinion, the district court must consider whether: (1) the expert is qualified to testify competently, (2) the methodology by which the expert reaches his conclusions is reliable, and (3) the expert's testimony assists the trier of fact to understand the evidence or determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562-63 (11th Cir. 1998); *Bryan v. Whitfield*, 3:14-cv-341/MCR/EMT, 2015 WL 3407485, at *2 (N.D. Fl. Mar. 16, 2015) (Rodgers, J.).

Although the focus of this inquiry should be on principles and methodology, conclusions and methodology are not entirely distinct. Neither *Daubert* nor Rule 702 requires the district

court to admit opinion evidence that is only connected to existing data by the *ipse dixit* of the expert. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146; *Chapman v. Procter & Gamble Distr., LLC*, 766 F.3d 1296, 1305-06 (11th Cir. 2014). Instead, the district judge must determine whether the evidence is genuinely scientific or unscientific speculation offered by a genuine scientist. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316-17 (11th Cir. 1999).

Plaintiffs bear the burden of establishing the admissibility of Dr. Flowers's testimony by a preponderance of the evidence. *See Allison*, 184 F.3d at 1306. This burden is "substantial." *Cook ex rel. Tessier v. Sheriff of Monroe Cnty., Fla.,* 402 F.3d 1092, 1107 (11th Cir. 2005). Plaintiffs' burden also requires more than just "taking the expert's word for it." Fed. R. Evid. 702, advisory committee's note, 2000 amendment (internal quotation marks omitted). In this instance, Dr. Flowers's opinions as to contamination constitute unscientific speculation masquerading as science. The Court should exercise its gatekeeping function and preclude Dr. Flowers's contamination opinions.

## ARGUMENT

### I. Dr. Flowers's Opinion that Soil in the Community Is "Contaminated" from the Koppers Site Is Unreliable and Should be Excluded

Dr. Flowers offers two principal conclusions relevant to soil contamination in his report. First, he opines that "[s]oils throughout the proposed Class Area are contaminated with dioxin and DLC" (the "soil contamination conclusion"). (Flowers Rep., p. 10.) Second, that the soil samples indicate that the Koppers facility is the point source of the contamination (the "point source conclusion"). (*Id.*, p. 8.)

#### A. Dr. Flowers's Soil Contamination Conclusion Is Unreliable

Dr. Flowers's claim that the soil in the proposed class area is contaminated does not survive *Daubert*-scrutiny. Under *Daubert*, the Court must scrutinize the selected methodology to

6

ensure that it has been reliably applied. *Olin v. Demings*, No. 6:12-1455-Orl-28TBS, 2014 WL 117081, at *3 (M.D. Fla. Jan. 13, 2014); *Tiller v. Ford Motor Co.*, No. 03-489, 2006 WL 166530, at *8 (M.D. Fla. Jan. 21, 2006 ).  Dr. Flowers's invented methodology for determining contamination is unhelpful and unreliable and should be excluded.

          i.      Dr. Flowers's Garden of Eden Background is Arbitrary and Unhelpful

As a first step in his invented methodology, Dr. Flowers assembles a background number for a comparison from an area that is dissimilar to the proposed class area.  The City of Gainesville, including the proposed class area, constitutes an urban area. (Deposition of Michael R. Corn, P.E. (FL), BCEE ("Corn Dep."), p. 183 (attached as Exhibit 3).)  Instead of constructing a background that is an apples to apples comparison with the proposed urban class area, Dr. Flowers uses rural background data from a 2007 Environmental Protection Agency study with <u>no prior dioxin presence</u>. (Flowers Dep., p. 98; Flowers Rep., p. 6.)  In Dr. Flowers's words, this selected background represents the "Garden of Eden dioxin content—out in the boonies." (Flowers Dep., p. 98.)  All the soil samples taken from his Garden of Eden background were "significantly removed from any source of dioxin." (*Id.*, pp. 98-99.)  However, Dr. Flowers fails to explain <u>why</u> his self-described "Garden of Eden" background is appropriate in this case or <u>why</u> a comparison between the two supports an opinion that a higher number than the "Garden of Eden" somehow equates with "contamination."

Despite using a Garden of Eden background with the lowest levels of dioxin concentrations, Dr. Flowers conceded in his deposition that there are considerable variations in background levels of dioxins in soils across the United States. (*Id.*, p. 96.)  Dr. Flowers acknowledged that urban environments, such as the proposed class area, generally have higher concentrations of dioxin than rural areas—due the variety of urban sources of dioxin, such as

7

automobile traffic, train traffic, and fires. (*Id.*, pp. 88-89.) With all of these dioxin sources that are part of an urban area, Dr. Flowers conceded such background numbers would not be expected to be found and do "not exist in Gainesville" (*Id.*, pp. 87, 99.) Which raises the question of why his comparison to the "Garden of Eden" matters?

Obviously, when compared against an urban environment, such as the proposed class area, Dr. Flowers is going to find "contamination." Remediation would be required of every urban neighborhood in this country if his rural, "Garden of Eden" standard were to apply. By comparing urban areas to a pristine rural background number, Dr. Flowers's comparison is nothing more than an unreliable and unsupported argument aimed at convincing the Court that a problem exists in the class area.

        ii.        Dr. Flowers's Contamination Benchmark Based on Rural Background Is Without Support

Dr. Flowers's rural benchmark as a definition for contamination is neither supported nor explained in his report. It is not proper for an expert to simply conjure up a conclusion without explaining the steps taken to come to that conclusion. *Tiller v. Ford Motor Co.*, No. 03-489, 2006 WL 166530, at *8 (M.D. Fla. Jan. 21, 2006) (finding that expert's "methods of essentially conjuring up the $10-$20 figure, without proffering supporting calculations illustrating how he arrived at those numbers, renders this testimony unreliable under Daubert"). Here, Dr. Flowers simply defines contamination as the concentration mean of his self-selected background. (Flowers Dep., p. 121.) Dr. Flowers's report fails to provide a methodology supporting that background or explain why that background is the appropriate way to judge soil contamination. Given that Dr. Flowers's report is silent as to his process or the rationale supporting it, the Court is left without sufficient information to assess whether Dr. Flowers's conclusion is reliable. *McClain,* 401 F.3d at 1245 ("[T]he trial court's gatekeeping function requires more than simply

taking the expert's word for it." (internal quotation marks omitted)).  As a result, the Court should reject Dr. Flowers's contamination benchmark.

        iii.    Dr. Flowers's Soil Samples Include Areas Far Removed From the Koppers Site

Dr. Flowers's report compared his Garden of Eden rural background numbers to soil samples taken up to 19 miles from the Koppers Site.  (Flowers Rep., p. 7.)  The second sampling campaign, upon which he relied, collected 66 soil samples from an area that extended approximately 19 miles from the Koppers Site to the western edge of Alachua County, Florida and into the next.  (*Id.*, p. 4.)  In his analysis, Dr. Flowers compared his rural background numbers from the EPA report to both sampling campaigns, which include samples near interstate highways, cement kilns, and other non-plant related sources of dioxin.  (Flowers Dep., pp. 116-17; Flowers Rep., p. 7.)  The statistics he used to base his opinions, namely that 44% of the 179 soil samples exceeded rural background and were contaminated, are based on many samples that have nothing to do with the Koppers Site.  (*Id.*)

Dr. Flowers makes leaps from this data that are simply not justified.  This analysis does not lead to or support the conclusion that because 44% of 179 samples are "contaminated, or exceed the Garden of Eden" average, therefore "soil contamination was common in the proposed Class Area" and that "[m]ost of the exceedances are located in the proposed Class Area adjacent to the site."  (Flowers Rep., p. 7.)  In his own words, high numbers from 10 miles to the west, which are part of his "Class Area" data set, may be associated with recognized sources of dioxin, like cement kilns, rail lines, and interstate highways.  (Flowers Dep., pp. 44, 116-117.)

        iv.    Dr. Flowers's Soil Site-Specific Conversion Factor is Unreliable

Dr. Flowers also applies a site-corrected version of the Florida remediation standard of 7 parts per trillion for dioxin in soil to conclude that 10% of the soil samples exceed the Florida

9

remediation standard. (This is before remediation of the soil in the yards near the Koppers Site took place, the effect of which he has not addressed or performed any analysis.) (The extent of the remediation was addressed by Beazer East's representative Mitchell Brourman at his deposition. (*See, e.g.*, (Deposition of Mitchell D. Brourman ("Brourman Dep."), pp. 273-296 (attached as Exhibit 4).)) Dr. Flowers's site-corrected Florida remediation standard was an attempt by him to address the many CALUX issues, but it remains flawed and unreliable. The Florida remediation standard is 7 ng TEQ/kg. (Flowers Rep., p. 7.) But since Dr. Flowers used only CALUX data, he was unable to compare his near-site soil samples to the Florida remediation benchmark. Instead of remedying this situation by using the more reliable GC/MS data, Dr. Flowers concocted a CALUX equivalent for the 7 ng TEQ/Kg Florida standard. (*Id.*, p. 7.) By using a multiplier he received from a non-disclosed consultant (who has since provided a rebuttal report that is the subject of a motion to strike), Dr. Flowers arrives at a CALUX equivalent soil remediation figure of 46.7 ng TEQ/Kg. (Flowers Dep., p. 67.)[1] The underlying but flawed assumption of Dr. Flowers's use of the site correction figure is that all samples contain interfering non-chlorinated dioxins in the same <u>predictable</u> proportions. (Uhler Rep. at 16.) But, dioxin concentrations are almost <u>never</u> uniform due to the variety of sources of brominated dioxins. And, Dr. Flowers concedes that, in the present case, the actual numbers can vary up to 1800%, which in his words is a "significant range." (*Id.*, p. 73) This lack of uniformity eviscerates the reliability of Dr. Flowers's "average" site specific correction factor. This point is further addressed in the Motion to Exclude the CALUX-based opinions.

---

[1] A site specific correction factor is derived by comparing the CALUX TCDD-BEQ to the GC/MS TCDD-TEQ for each sample. The average is then computed by adding the individual correction factors and dividing by the number of samples. (Expert Report of Allen D. Uhler, Ph.D., July 15, 2015 ("Uhler Rep."), p. 16 (attached as Exhibit 5); Flowers Dep., p. 65.)

          v.        Dr. Flowers's Methodology is Unreliable Because He Fails to Consider Other Relevant Factors

Dr. Flowers ignores relevant data directly bearing on the reliability of his soil sampling. The Alachua County Public Schools conducted a soil sampling campaign sometime in 2011 (the "School Study"). The purpose of the School Study was to determine if the soil of three schools near the Koppers Site (and the proposed class area) were contaminated as a result of activities at the Koppers Site. The study determined that <u>no</u> dioxins were detected in <u>any</u> of the soils samples at levels above the Florida remediation standard. (February 8, 2011, Results of Soil Testing Conducted at Three Alachua County Schools, Water & Research, Inc., ("School Rep."), p. 3, (Exhibit 9 to Flowers Dep. and attached hereto as Exhibit 6).) At his deposition, Dr. Flowers dismisses the importance of the School Study as "just . . . some additional samples." (Flowers Dep., p. 76.)

Even more troubling, a number of Dr. Flowers non-background soil samples were subject to soil remediation in 2014. (*Id.*, p. 94.) Dr. Flowers acknowledges in his report that soil remediation occurred and that, according to the Environmental Protection Agency, "residential yards are once more safe for residents to use." (Flowers Rep., p. 2.) Yet, Dr. Flowers relied entirely on soil samples taken <u>before</u> remediation was completed. (Flowers Dep., p. 111.) This calls into question how Dr. Flowers can conclude that the soil in the proposed class area is currently contaminated without resampling the proposed class area. Dr. Flowers's ignorance of the School Study combined with neglecting to consider, let alone resample the soil of the proposed class area post-remediation, highlights the unreliability of his methodology.

        B.        Dr. Flowers's Point Source Conclusion Is Inadmissible *Ipse Dixit*

Last (as to soil), Dr. Flowers concludes that the samples he studied are consistent with the Koppers Site being a point source of contamination. (Flowers Rep., p. 8.) The sole basis for this

conclusion is that soil contamination decreases with distance from the Koppers Site. (*Id.*)  Dr. Flowers admits in his report and deposition that there are a number of samples above his contamination benchmark not within the class area. (Flowers Dep., p. 127; Flowers Rep., p. 7.) But Dr. Flowers is quick to explain these as outliers subject to confounders, such as a cement plant. (Flowers Dep., p. 127.)  Despite his recognition that there are other possible sources of dioxin contamination in the area, Dr. Flowers does not <u>consider</u> whether any of these alternative sources account for the allegedly elevated dioxin concentrations in the proposed class area. (Flowers Dep., p. 128.)

As clearly articulated in the 2000 Advisory Committee notes, an expert's failure to account for obvious alternative explanations is an additional factor bearing on reliability.  Fed. R. Evid. 702 Advisory Committee's notes.; s*ee also Innis Arden Golf Club*, 629 F. Supp. 2d 175, 188 (D. Conn. 2009) (collecting additional authority rejecting expert testimony when expert fails to assess potential alternative explanations).  In *Innis Arden Golf Club*, the district court excluded testimony of a chemical fingerprinter, in large part because he reached his conclusion that defendant was the source of contamination without considering any other explanations.  (*Id.* at 189.)  The district court excluded the testimony of a second expert on the same grounds, concluding:

> The infirmities in [the] expert opinions go well beyond being merely the stuff of cross-examination.  At bottom, the experts' conclusions – by the experts' own admissions – were not the process of an open-minded search for the truth about the Innis Arden contamination.  A scientific inquiry is one based on a "systematic pursuit" of knowledge through "testing and confirmation." [the first expert's] opinions, being based on a process that was artificially narrow and confined to an incomplete set of data, are not scientifically valid. [the second expert's] findings, which are necessarily duplicative of [the first], fare no better.  To use the language of Rule 702, the opinions are neither "based on sufficient facts or data" nor "the product of reliable

12

>> principles and methods." The testimony will not "assist the trier of fact to understand or determine" the "fact[s] in issue" in this matter.

(*Id.* at 190-91 (internal citations omitted)); *see also Coleman v. Union Carbide Corp.*, Civ. No. 2:11-0366, 2013 WL 5461855, at *38 (S.D. W.V. Sept. 30, 2013) (finding an expert's analogy of an 800-pound gorilla in the backyard and a 50-pound monkey across town to be "decidedly unscientific" as a basis to assign a site as the source of contamination). Dr. Flowers' failure to account or factor in known alternative explanations for the allegedly elevated dioxin concentrations in the proposed class area is particularly troubling because Dr. Flowers relied on CALUX data which, he admits, is not able to indicate the source of dioxins. (*Id.*, pp. 57-58.) As a result, any conclusion that the Koppers Site is the point source of contamination is speculation.

## II. Dr. Flowers' Living Area Dust Contamination Opinion Are Unreliable

In addition to offering an opinion on soil contamination, Dr. Flowers has opined that the living space dust found in the homes in the proposed class area is contaminated. (Flowers Rep., pp. 7-8.) Dr. Flowers's dust contamination opinions should be rejected for several reasons, including: (1) they are based solely on a comparison to yet another background study, this time one created by Dr. Sawyer who looked at not just living area dust but also samples taken from the floors of various houses in 2012 by the EPA; and (2) his dust sample results are from samples up to 19 miles away from the Koppers Site, thereby measuring dioxins from a variety of other sources, including brominated dioxins and polychlorinated biphenyls. At the end of the day, the fact that sample averages are greater or less than a background number contrived by Dr. Sawyer is of no relevance whatsoever.

> A. Dr. Flowers Reliance on the Opinion of Dr. Sawyer Renders His Dust Contamination Opinion Unreliable

Dr. Flowers' dust contamination opinion is derivative and entirely dependent upon the work of Dr. Sawyer. (Flowers Rep., p. 8; Flowers Dep., p. 129.) For the reasons set forth in the Defendants' motion relating to Dr. Sawyer (incorporated herein by reference), Dr. Sawyer's testimony and report as to in-home dust contamination is unreliable and should be excluded. In fact, Dr. Sawyer's same contrived background benchmark has been considered on a *Daubert* motion and rejected. *See Adams v. Cooper Indus., Inc.*, 2007 WL 1805586, at *2-4 (E.D. Ky. Jun. 21, 2007) (rejecting Dr. Sawyer's methodology of comparing the plaintiffs' dioxin levels to the "background" population as not a scientifically valid methodology). Dr. Sawyer and Dr. Flowers are trying to apply the same plaintiff-to-background methodology rejected in *Adams* in this case. Because Dr. Flowers relied upon the unreliable background figure of Dr. Sawyer, his testimony and report should likewise be excluded. *See TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732-33 (10th Cir. 1993) (excluding expert's opinion based on another expert's opinion "where the expert failed to demonstrate any basis for concluding that another individual's opinion . . . was reliable, other than the fact that it was the opinion of someone he believed to be an expert.").

Specifically, Dr. Flowers based his dust contamination opinion entirely on a background number generated by Dr. Sawyer of 57.08 ng TEQ/Kg for living space dust that considered both floor samples and living space results ("57.08 benchmark"). (Flowers Rep., p. 8; Flowers Dep., p. 129.) In his report and deposition, Dr. Flowers failed to explain why he accepts, without reason, Dr. Sawyer's 57.08 benchmark as valid. As explained in the motion directed toward Dr. Sawyer, the 57.08 benchmark suffers several fatal flaws—it is a mix of indoor floor dust and living area dust and, more importantly, there is no showing that the number has any regulatory or toxicological significance. No regulations, standards, or guidelines are referenced. Since Dr.

14

Sawyer's 57.08 benchmark is fundamentally flawed, Dr. Flowers's dust contamination conclusion and his ability to define a class are also fundamentally flawed. For this reason alone, his dust contamination conclusion concerning living area dust should not be considered.

In addition, Dr. Flowers includes in his analysis of Plant Site data living dust sample results which are classified, and in some instances rejected by Sawyer, as background. Sawyer characterizes 18 sample locations from the 2014 living space exercise as background, as discounts two of them as outliers because the detections were outside of his acceptable limits. Dr. Flowers, however, mixes those same sample results, including those both used by Sawyer as background and rejected, and lumps them into his analysis of house living area sample results contaminated by the plant. This inconsistency alone renders the plaintiffs' analysis meaningless.

B. Dr. Flowers's Living Area Dust Samples Are Tainted

Dr. Flowers's living dust contamination is also tainted by the inclusion of polychlorinated biphenyls ("PCBs") in his proposed class area samples. As discussed in the CALUX motion, one of the CALUX method's many flaws is the CALUX method measures dioxins and dioxin-like compounds, such as PCBs. (Flowers Dep., p. 55.) PCBs, however, can be removed from dust samples. Recognizing that PCBs are not associated with the Koppers Site, the Plaintiffs removed the PCBs from their 2014 dust samples. (*Id.*, p. 62. ("I never read anything about Koppers using PCBs."); Deposition of Allen D. Uhler, Ph.D. ("Uhler Dep."), p. 234 (attached hereto as Exhibit 7).) But the Plaintiffs' miscalculated the dioxin concentrations of their 2010 dust samples by <u>adding</u> the PCBs. (Uhler Dep., p. 234.) The improper inclusion of PCBs resulted in improperly elevated dioxin concentrations. (*Id.*) Dr. Flowers relied upon the 2010 incorrectly calculated dust results in coming to his conclusion that the living space dust of the

15

proposed class is contaminated. (Flowers Rep., pp. 3-4, 8.) The inclusion of the 2010 data in Dr. Flowers's report was an error and taints his results.

### III. Dr. Flowers's Opinion Offers No Reliable Methodology to Support His Opinion that Attic Dust in the Class Area Is Contaminated

Finally, Dr. Flowers concludes that attic dust in the proposed class area is contaminated. (Flowers Rep., p. 8.) This conclusion is based on no analysis other than a comparison to Dr. Sawyer's background number for living areas and floor sample dust. Dr. Flowers's report fails to include any meaningful analysis of attic dust or comparison to reach conclusions about what the numbers mean. Moreover, the numbers are based on data taken from more than 19 miles away, and for sample locations with clear alternative sources for the levels found. Dr. Flowers does not address variability in the levels observed or demonstrate that he has considered alternate explanations. For instance, Dr. Flowers was asked at deposition about the attic dust found in two homes located near each other and about four miles from the Koppers Site. (Flowers Dep., pp. 160-61.) These two homes reported attic dust concentrations of 79 parts per trillion CALUX and 0.1 parts per trillion CALUX. (*Id.*, p. 161). When asked to explain the drastic discrepancy between the two dust concentrations, Dr. Flowers responded that "[i]t could be anything." (*Id.*, p. 161.) Further, when asked if he was surprised by the variety of the numbers, he responded, without explanation, "no." (*Id.*, p. 162.)

Dr. Flowers's deposition testimony epitomizes the approach he undertook in his report. Dr. Flowers did not do an independent attic dust analysis other than to chart it out and calculate statistics about it. He simply relied upon Dr. Sawyer's 57.08 unrelated benchmark. But even Dr. Sawyer acknowledges that his 57.08 benchmark is only representative of living space dust. Dr. Flowers knew this and used it anyway for his attic analysis. (*Id.*, p. 129 (answering that the 57.08 benchmark is "just living space dust"); Flowers Rep. at 9.) Dr. Flowers conceded in his

16

deposition that there could be different sources for contamination in the attic as opposed to living area dust.  (*Id.*, pp. 129-30.)  Dr. Flowers's conclusion as to attic dust contamination is another example of Dr. Flowers basing a conclusion on an improper apples to oranges comparison.

Finally, there is no analysis in terms of what standards or objective criteria Dr. Flowers is using in evaluating attic dust.  He makes no attempt to rule out alternative causes to his results.  He has no benchmark to make a determination of contamination that is applicable to attic dust numbers.  His conclusions are the ultimate "it is because I said it is."  The lack of scientific rigor in his approach renders his ultimate conclusions inadmissible; his opinion should be excluded.

## CONCLUSION

Dr. Flowers does minimal analysis to support his conclusions that the soil, living area dust, and attic dust are contaminated.  The methodology he uses does not support the conclusions he reaches.  For the above reasons, Defendants request that the Court exercise its gatekeeping power under Rule 702 and *Daubert* to exclude Dr. Flowers's report.

## LOCAL RULE 7.1 CERTIFICATE

The undersigned counsel for Defendants certifies that he conferred with Plaintiffs' counsel in a good faith effort to resolve by agreement the issues raised but no agreement was reached.

Date:   September 10, 2015                                          Respectfully submitted,

/s/ Cal R. Burnton
Benjamin H. Hill, III (FBN 094585)
Dennis P. Waggoner (FBN 509426)
HILL, WARD & HENDERSON P.A.
101 East Kennedy Blvd., Suite 3700
P.O. Box 2231
Tampa, FL 33602
Phone: (813) 221-3900
Fax: (813) 221-2900

and

Cal R. Burnton (ILBN 8186365)
*Admitted to Northern District Bar 5/12/14*
Steptoe & Johnson LLP
115 S. LaSalle, Suite 3100
Chicago, IL 60603
Phone: (312) 577-1300
Fax: (312) 577-1370

ATTORNEYS FOR BEAZER EAST, INC.
and KOPPERS INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record in this action.

/s/ Cal R. Burnton

**CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record in this action.

/s/ Cal R. Burnton